IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BYRON DUANE GIPSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-3258 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION,[1] | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary

Judgment and Memorandum in Support thereof (Document No.14), Defendant's Response to

Plaintiff's Motion for Summary Judgment (Document No.16), Defendant's Motion for Summary

Judgment (Document No. 12) and Memorandum in Support thereof (Document No.13) and

Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 15). After

considering the cross motions for summary judgment, the administrative record, and the applicable

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Michael J. Astrue as the defendant in this action.

[2] The parties consented to proceed before the undersigned Magistrate Judge on January 30, 2013.  (Document No. 11).

law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 11) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I.  Introduction

Plaintiff, Bryon Duane Gipson, ("Gipson") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability benefits ("DIB"). Gipson argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Allen G. Erickson, committed errors of law when he found that Gipson was not disabled. Gipson argues that he has been disabled since February 15, 2009, due to human immunodeficiency virus ("HIV")/Acquired Immune Deficiency Syndrome ("AIDS"), peripheral neuropathy in both legs, hepatitis C, depression, headaches, spine injury and rheumatoid arthritis. In a disability report that Gipson completed near the time he filed for benefits, he stated he could not work because of HIV and a  "problem right leg." (Tr. 272). In a function report completed the same time, Gipson elaborated on the primary problems that precluded him from working: "I can't really work because my leg when I was in the hospital for my HIV and syphilis. I had a spinal tap and it messed up my legs. I have a severe limp that limits my movement. I can't even do what I love anymore which is drive a forklift and yes and yes I do have a cane to help me walk." (Tr. 291). Gipson seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Gipson was not disabled, that the decision comports with applicable law, and that the decision  should, therefore, be affirmed.

## II.  Administrative Proceedings

On April 15, 2009, Gipson filed for disability insurance benefits ("DIB") claiming that he has been disabled since February 15, 2009, due to Human Immunodeficiency Virus ("HIV") and problems with his right leg. (Tr. 238-243). The Social Security Administration denied his application at the initial and reconsideration stages.  (Tr.132-133, 152-155, 160-162). Gipson then requested a hearing before an ALJ.  (Tr.163-165).  The Social Security Administration granted his request, and the ALJ held a hearing on February 16, 2010. (Tr.24-72). On February 26, 2010, the ALJ issued his decision finding Gipson not disabled. (Tr. 132-147).

Gipson sought review by the Appeals Council of the ALJ's adverse decision.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. The Appeals Council, on May 28, 2010, granted Gipson's request for review, and remanded the matter to the ALJ with instructions to reevaluate the treating source opinion in Exhibit 9F because it was unclear whether the assessment had been completed by Dr. Roberto Andrade, Gipson's treating physician or by Roberto Sandoval, his physical therapist, and for further development of the record concerning Gipson's past work as a telephone operator. (Tr.149-150). Pursuant to the Order of Remand from the Appeals Council, a second hearing was held November 24, 2010. (Tr. 73-131). On February 28, 2011, the ALJ issued his decision finding Gipson not disabled. (Tr. 6-22). Gipson sought review by the Appeals Council of the ALJ's decision. (Tr. 5) The Appeals Council denied Gipson's request on August 30, 2012. (Tr. 1-4) Gipson has timely filed his appeal of the ALJ's decision.   The Commissioner has filed a Motion for Summary Judgment (Document No. 12), to which Plaintiff

filed a Response. (Document No. 15).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 14), to which Defendant has filed a Response.  (Document No. 16).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 768.  (Document No. 6).  There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  *Id.*   While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C.  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his February 28, 2011, decision, that Gipson was not disabled. In particular, the ALJ determined that Gipson had not engaged in substantial gainful activity since February 15, 2009, (step one); that Gipson's HIV/AIDS, peripheral neuropathy in both legs and Hepatitis C were severe impairments (step two) but the above impairments either singly or

in combination did not meet or equal a listed impairment in Appendix 1 of the regulations (step

three); the ALJ further found at step two that Gipson's depression, excruciating headaches, injury

to spine and rheumatoid arthritis were non-severe impairments; next, based on the medical records,

and the testimony of Gipson, the ALJ found that Gipson had the residual functional capacity

("RFC") to perform sedentary work subject to certain restrictions. Gipson must be able to sit and/or

stand at will. He must use a cane to ambulate. He could not climb ropes, ladders, or scaffolds and

he could not crawl. He could not use foot controls bilaterally. Occasionally, Gipson could climb

stairs and ramps and could stoop, kneel or crouch. The ALJ found that Gipson could not perform his

past relevant work (step four). The ALJ further found that based on Gipson's RFC, his age,

education and the testimony of a vocational expert, he could perform work as a sorter, an optical

goods worker and a jewelry bench worker and was not disabled within the meaning of the Act (step

five).  As a result, the Court must determine whether substantial evidence supports the ALJ's step

five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs

four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as

testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's

educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V.  Discussion

The medical records reveal that Gipson has been diagnosed with and treated for HIV/AIDS,

syphilis, neuropathy, hepatitis C.  Gipson's medical care has been provided through the Harris

County Hospital District, which includes Ben Taub Hospital and the Thomas Street Community

Clinic. Gipson was seen at Ben Taub Hospital on September 30, 1999. The progress note described

him as a new patient with HIV/AIDS. (Tr. 545, 546). Gipson was prescribed anti-HIV drugs (antiretroviral medications). Subsequent records from 1999 through 2008, reveal he responded favorably to the antiretroviral medications. He had a normal viral load and his CD4 cells or T-cells were within normal ranges and his condition was asymptomatic.[3] In addition to monitoring his HIV/AIDS, treating records show he sought treatment for neuropathy (right leg pain), conjunctivitis and scrotal pain.[4]

On   February 3, 2009, Gipson went to the Emergency Room at Ben Taub Hospital. He reported shortness of breath and a cough. He had not taken his antiretroviral medications for two years. Diagnostic testing confirmed a high viral load.  He was started on antiretroviral medications. In addition, he tested positive for Hepatitis C and syphilis. He was hospitalized for twelve days.  (Tr. 339,350, 358-361, 363-370, 386-390, 393-442, 450-531, 533-535, 603-691). During his hospital stay, he underwent a lumbar puncture and PICC line placement in the right upper extremity. Gipson responded to treatment and was discharged on February 15, 2009. (Tr. 346-349, 358-361). His condition on discharge was described as "good." (Tr. 348). According to the discharge summary, Gipson was counseled about his HIV/AIDS. Dr. Aithua Yen wrote: "[during his hospital course, many team members counseled him on the need for him to comply with medications and avoid becoming resistant to HIV medications and that he needed to go back to Thomas Street Clinic and

---

[3] The viral load measures the level of HIV in the blood. With consistent use of antiretroviral medications, the viral load can move to a point where it is undetectable. See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids. "CD4 or T-cells send signals to activate [the] body's immune response when they detect viruses or bacteria." *Id.*

[4] Gipson was treated on the following dates: (October 29, 1999 (Tr. 544), March 31, 2000 (Tr. 543), November 16, 2000 (Tr. 542), August 26, 2002 (Tr. 730-737), March 14, 2003 (Tr. 451), October 24, 2003, (Tr. 540, 721-729), July 26, 2004 (Tr. 712-721),  April 6, 2005 (Tr. 702-712), July 7, 2005 (Tr. 447-449), July 14, 2005 (Tr. 537), August 8, 2005 (Tr. 536), August 19, 2005 (Tr. 536), February 20, 2006 (Tr. 443-446, 533-535), June 30, 2006 (Tr. 532, 692-702) and July 3, 2006, (Tr. 532).

re-start HAART as soon as possible." (Tr. 348).

Following his discharge from Ben Taub Hospital, Gipson followed up at the Thomas Street Clinic. Because of Gipson's HIV/AIDS status, he  was evaluated by Andrea Carter, a licensed clinical social worker ("LCSW"), with Clinical Case Management HIV Services on March 20, 2009. (Tr. 357-358). The purpose of the meeting was to reestablish and discuss "psycho-social" issues. Gipson denied any "psycho-social issues" and sought information about getting disability and employment related forms.

Gipson was seen by his treating physician, Dr. Roberto Andrade, on April 13, 2009.  (Tr. 351-357, 384-385, 589-594). Gipson reported 100% adherence with his antiretroviral medications and denied any obvious side effects from medications**.** Dr. Andrade noted that Gipson was limping. Gipson asked Dr. Andrade to prescribe him a cane. With respect  to Gipson's limping, Dr. Andrade wrote in pertinent part:

> He is limping but I couldn't find nothing at PE that explain his limping he state that happen post LP (at hospital) but is getting better, he requested a cane, and wants a form to be filled for his work stating that he can not drive the fork lift  but otherwise could do the rest.

> I filled also the SS from stating AIDS, don't know will work because he is already undetectable and syphilis is resolved. (Tr. 357, 385, 591).

Gipson was seen by Andrea Carter, LCSW, on May 5, 2009, and again on May 14, 2009. (Tr. 356, 384). The progress notes show that he requested information about Bering Omega Community Services/Houston Assistance Program. He denied having "psycho social concerns."

A Physical Residual Functional Capacity Assessment was completed by Scott Spoor, M.D., ("Dr. Spoor") on May 18, 2009, based on his review of Gipson's medical records. (Tr. 371-378). The Physical RFC Assessment reflects that Gipson was capable of occasionally lifting and/or carrying twenty pounds, frequently lifting and/or carrying ten pounds, standing and/or walking for six hours

in an eight-hour work day, sitting for six hours in an eight hour work day, and unlimited pushing and/or pulling. Dr. Spoor further opined that Gipson had no postural, manipulative, visual, communicative or environmental limitations. Dr. Spoor found that Gipson's alleged limitations were not fully supported by the record. (Tr. 376). Dr. Leigh McCary reached the same conclusion after she reviewed the record on August 17, 2009. (Tr. 391).

Gipson had a follow up appointment with Dr. Andrade on June 15, 2009. (Tr. 579-588). Gipson complained about numbness in both lower extremities and walking with a limp. The treatment note shows that Gipson neurologically was intact, had normal sensorium and normal knee reflexes. With respect to Gipson's complaints relating to his lower extremities, Dr. Andrade wrote:

> Lower extremities (Neuropathy?), not good clinical correlation. I am not sure that [lumbar puncture] was the culprit, but in any case he will be evaluated by Neurology to make sure its organic. He is applying to [Social Security] for disability benefits, I am not sure (hope not) is playing a factor in his presentation.
>
> I will send this patient for a Functional Capacity Evaluation by Robert Sandoval (PT) and wait to fill most of his form until we have a better picture. Meantime check PPD Bering housing requirement.
>
> I will fill the initial evaluation that is disabled for only up 6 months until we have the neurology response and the physical therapist evaluation.
>
> Then he may not qualify for disability based on HIV alone. (Tr. 580).

Dr. Andrade completed a HIV Interrogatory Form on June 15, 2009. (Tr. 547-548). Dr. Andrade diagnosed Gipson with hematological abnormalities and neuropathy (lower extremity weakness). Based on this diagnosis, Dr. Andrade opined Gipson currently was limited to working four hours a day, five days a week due to his ambulatory limitations but added that Gipson was scheduled for a CT/neurological evaluation.

Gipson was evaluated by Roberto Sandoval, a physical therapist. The results of the evaluation were incorporated in a Physical Residual Functional Capacity Questionnaire completed on June 22,

2009. (Tr. 549-552, ).  The Questionnaire was signed by both Roberto Sandoval, and Dr. Andrade. Dr. Andrade indicated he had reviewed and approved the Questionnaire. The Questionnaire reflects that Gipson has been treated on an intermittent basis for HIV/AIDS since 2006 .  His prognosis was described as "Fair."   Symptoms related to his HIV/AIDS diagnosis included bilateral lower [extremity ] numbness, and difficulty walking.  The Questionnaire asked whether the impairments had lasted or were expected to last at least twelve months.  The response was "no." The Questionnaire further asked whether the patient was a malinger. The response was "no." According to the Questionnaire, Gipson's impairments (physical plus any emotional) were not reasonably consistent with the symptoms and functional limitations set forth in the evaluation. However, it was noted that Gipson was to undergo a CT/Neurology evaluation to assess his complaints. With respect to Gipson's limitations, the Questionnaire states that he could frequently lift and carry ten pounds, occasionally lift and carry twenty pounds but could never lift or carry fifty pounds. He could frequently look down, turn his head right or left, look up or hold head in place. He also could occasionally twist. He would need to avoid bending, crouching/squatting, climbing ladders and climbing stairs. He could do unlimited reaching, handling or fingering. He could walk three to four city blocks without rest or severe pain, could sit for twenty minutes, stand for fifteen minutes, could sit, stand/walk for less than two hours.  He would need to shift positions at will and would need to take breaks.   He required a cane.

Roberto Sandoval, the physical therapist, recorded the findings of his examination of Gipson in a progress note. (Tr. 380-383, 574-577, 549-552).  He questioned Gipson about  how long he could sit (less than one hour), stand (less than one hour), walk (less than one hour), and climb. He tested Gipson's abilities to lift, carry, push, pull, squat, kneel, crawl, climb, reach, and to use his hands and feet. Based on the testing, he found Gipson could occasionally lift and carry, push and

pull, bend, squat, and reach. He could not kneel, crawl, or climb. He also could not use his feet to operate foot controls, and could do simple grasping, pushing, and pulling with his hands. He could not perform fast movements.  He rated Gipson's need to avoid unprotected heights, being around machinery, being exposed to temperature changes, driving automotive equipment, and being exposed to dust, fumes and gases as "mild." Overall, he found Gipson was capable of light work. He discharged him from therapy.

Gipson  had a follow up appointment with Dr. Andrade on December 14, 2009. (Tr. 559-573). The treatment note reveals that Gipson had been taking his HIV/AIDS medications 90% of the time. He denied any side effects from his medications. His examination results were unchanged from prior office visits. With respect to Gipson's complaints relating to leg pain, Dr. Andrade wrote: "neuropathy(?) no good clinical correlation...his reflexes are brisk good motor and sensation." The progress note indicates that Gipson missed his neurology appointment and that the appointment needed to be rescheduled.

Gipson was next seen by Dr. Andrade on March 29, 2010. (Tr. 746-747). His examination results were unchanged from prior visits. The note shows that Gipson's HIV was asymptomatic. He reported no obvious side effects from his medications. Gipson reported that his request for disability benefits had been denied but he planned to appeal the denial of disability benefits.

On June 15, 2010, Gipson was seen by Zishan M. Samiuddin, M.D., a psychiatrist with the Harris County Hospital District,. (Tr. 741-742).  He attributed his feelings of depression  for the past eighteen months to not having a job and being "given a cane to walk with."  (Tr. 741). Gipson reported that he had a pending appointment with neurology. Gipson reported that he had a good energy level, good appetite and slept well.  The results of his mental status examination were unremarkable. The progress note reveals that Gipson was well groomed, cooperative, and

maintained eye contact. His thought process was logical, coherent and goal directed.

Dr. Andrade completed a second Physical Residual Functional Capacity Questionnaire form on November 30, 2010. (Tr. 765-768).  Like the earlier Questionnaire, it  indicates that Gipson was evaluated by Roberto Sandoval, and the Questionniare was reviewed and approved by Dr. Andrade. The Questionnaire was accompanied by no contemporaneous progress notes by either Roberto Sandoval or Dr. Andrade.   In the second Physical Residual Functional Capacity Questionnaire, Dr. Andrade identified lower extremity pain as a symptom experienced by Gipson. The lower extremity pain  was described as "sharp" and accompanied by numbness.  Side effects of the HIV medications that could affect Gipson's ability to work included diarrhea, dizziness, and drowsiness.  In response to whether Gipson's impairments have lasted or can be expected to last at least twelve months, Dr. Andrade responded affirmatively. Likewise, in response to whether emotional factors contribute to the severity of the symptoms and functional limitations, Dr. Andrade responded "yes." Dr. Andrade identified depression as a psychological condition affecting Gipson's physical condition. He further found that Gipson's physical impairments plus any emotional impairments were reasonably consistent with his symptoms and functional limitations. Other changes included that Gipson could walk less than one city block without severe pain or rest, and could sit for fifteen minutes.

Gipson argues substantial evidence does not support the ALJ's determination about the severity of his impairments.  He further argues that substantial evidence does not support his RFC determination.   According to Gipson, the ALJ failed to develop the record. Gipson maintains the ALJ could have and should have utilized updated medical expert opinions on severity, equivalency and RFC and consulted with a medical expert.  Gipson argues that voluminous medical records were submitted *after* the disability determination unit physicians rendered their medical opinion based on their review of the record.  According to Gipson, this undermines the opinions of the disability

determination unit physicians. The Commissioner counters that the ALJ considered the totality of the medical records and acted within his discretion when he concluded updated medical expert opinion evidence or a consulting expert testimony was not necessary.  In addition, the Commissioner responds that Gipson has not come forward with medical evidence that was not considered by the ALJ or indicated what additional evidence would have been adduced that would have changed the ALJ's decision.

Substantial evidence supports the ALJ's determination that Gipson's Hepatitis C, peripheral neuropathy and HIV/AIDS were severe impairments at step two and that such impairments, individually or in combination, did not meet or equal a listed impairment. The record shows that Gipson tested positive for Hepatitis C in February 2009. Notwithstanding this diagnosis, because none of the medical records showed that he had a chronic liver disease with hemorrhaging, ascites, spontaneous bacterial peritonitis, hepatorenal syndrome, hepatopulmonary syndrome, hepatic encephalopathy or end stage liver disease, his condition did not meet or equal listing 5.05. Likewise, while the medical records reveal that Gipson was diagnosed with and treated by medication for neuropathy, because there was no showing of motor function disorganization, he did not meet or equal listing 11.14.  Finally, the objective medical evidence shows that Gipson has been diagnosed and treated for HIV/AIDS. He responded favorably to antiretroviral medications and his HIV/AIDS was asymptomatic. He did not meet or equal Listing 14.08 because there was no evidence of HIV along with a bacterial, fungal, protozoan, or viral infection; malignant neoplasms; extensive fungating or ulcerating lesions resistant to treatment; HIV encephalopathy characterized by cognitive and motor dysfunction that limits function and progress; HIV wasting syndrome; repeated manifestations of HIV infection; or treatment resistant sepsis, meningitis, septic arthritis, pneumonia, or sinusitis.

At step two, the claimant bears the burden of showing that he has a severe impairment or combination of impairments that significantly limits the claimant's physical or mental ability to do basic work activities. The step two requirement that the claimant have a severe impairment is generally considered to be "a de minimis screening device to dispose of groundless claims." *Stolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Eckert*, 482 U.S. 137, 153-154 (1987)). "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)(quoting *Estran v, Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)). Even if an impairment is found non-severe at step two, the ALJ must still "consider the limiting effects of [a claimant's] impairment(s) even those that are not severe, in determining [RFC]." 20 C.F.R. § 404.1545(e); see also 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (The ALJ must "consider the combined effects of all impairments, without regard to whether any such impairment, if considered separately, would be of sufficient severity.")

Substantial evidence also supports the ALJ's determination at step two that that Gipson's rheumatoid arthritis, severe headaches, depression and injury to the spine were not severe impairments.  Although Gipson alleged rheumatoid arthritis as a severe impairments, no medical records support this diagnosis much less treatment for rheumatoid arthritis.  Indeed, Gipson in a dental treatment record from July 6, 2009, did not identify rheumatoid arthritis as medical issue. (Tr. 554-558).  As for Gipson's allegation he suffered from excruciating headaches, other than his testimony that he had excruciating headaches, the medical records do not show that Gipson complained of excruciating headaches and headache pain to his health care providers or that he took

any medication (over the counter or prescribed) for the pain.

Gipson also alleged depression as a severe impairment. While Dr. Andrade in the Physical Residual Functional Capacity Assessment Questionniare identified depression as an impairment, none of his treating records indicate that Gipson complained about being depressed, that he found Gipson depressed, that he prescribed medication for depression or referred Gipson for an mental health evaluation or counseling. In addition, the record shows that Gipson was evaluated by Dr. Zishan M. Samiuddin, on June 15, 2010. His chief complaint was depression. Gipson reported he had been depressed since being given a cane to help him walk and difficulty being out of work. The results of his mental status examination were unremarkable and there was no indication that Gipson was to have a follow up appointment. She prescribed no medication to treat his depression. Finally, the record further shows that following Gipson's hospitalization in February 2009, he was seen several times by the licensed clinical social worker. Gipson repeatedly denied any "psycho-social" issues. Upon this record substantial evidence supports the ALJ's step two determination that depression was not a severe impairment.

As to the ALJ's determination that Gipson's back injury was not a severe impairment, the record shows that Gipson underwent a lumbar puncture during his February 2009 hospitalization. Subsequent treating records show that Dr. Andrade could find no clinical correlation between the lumbar puncture and his allegations of back injury. Dr. Andrade referred Gipson for a neurology/Ct scan for further investigation of his complaints to determine if there was an organic cause for his complaints. However, there are no records or indication that Gipson ever underwent an evaluation. At the November 24, 2010, hearing, the ALJ noted that the CT scan was scheduled for November 30, and the record was left open to submission of medical evidence. (Tr. 113). Given the absence of any additional records from the neurological examination or CT scan, and Dr. Andrade's treating

records that show Gipson was neurologically intact, with normal sensorium and normal knee reflexes, substantial evidence supports the ALJ's determination at step two that Gipson's injury to his spine was not a severe impairment.

As for Gipson's suggestion that the ALJ erred by relying on opinions of Dr. Spoor or Dr. McCrary, who reviewed Gipson's records in 2009 in light of the numerous records submitted since 2009, there is nothing in the subsequent records that undermine the determinations by the disability determination unit physicians. The ALJ considered all the records, and there is nothing in Gipson's records since 2009 that undermine the ALJ's consideration of Dr. Spoor or Dr. McCary's determinations. The regulations do not require the ALJ to elicit the opinion from a medical expert in every case. See 20 C.F.R. 404.1527(e)(2)(iii); *Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir. 1989). Decisions concerning whether a claimant meets or equals a Listing and a claimant's RFC are reserved to the Commissioner. *see* 20 C.F.R. 404.1527(d)(2); Soc.Sec. Ruling 96-5p, 1996 WL 374183, at 2, 3, 5 (S.S.A. 1996); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at 3, 4. As discussed above, Gipson has cited nothing in the additional records since 2009 that suggest he met or equaled a Listing. As for Gipson's argument that the cumulative physiological/psychological nexus between his disparate mental and physical conditions made this a medically complicated case that required the consultation of a medical expert, the record does not substantiate Gipson's contention that this was a medically complicated case that warranted the consultation of a medical expert. The Fifth Circuit has held that the ALJ has a duty to fully and fairly develop the facts relating to a claim for benefits. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000). Reversal of the ALJ's determination is warranted only where the plaintiff can show prejudice from the ALJ's failure to develop the record. Prejudice can be demonstrated by "showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led

to a different decision." Id. (quoting *Ripley v. Chater*, 67 F.3d 552, 577 n. 22 (5th Cir. 1995). Here, Gipson has failed to show that he was prejudiced by the ALJ's failure to obtain updated medical expert opinion evidence or consult a medical expert.

Substantial evidence also supports the ALJ's finding that Gipson had the RFC to perform sedentary work with restrictions. The determination of a claimant's RFC is the sole responsibility of the ALJ. *See Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). The regulations provide that the ALJ's formulation of a claimant's RFC should include consideration of any impairment alleged, whether found severe or not by the ALJ. see 20 C.F.R. § 404.1545(a)(2). Gipson argues that the ALJ erred by not considering his depression in formulating his RFC. The Commissioner counters that Gipson has not shown he was prejudiced by the failure of the ALJ to discuss his depression in his RFC formulation. Here, the ALJ alluded to Gipson's depression in assessing Gipson's credibility. He also rated the degree of the functional limitation resulting from Gipson's alleged depression in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The ALJ determined that Gipson's depression "at best" resulted in a mild limitation in restrictions of daily living, and that he had no limitations in social functioning, concentration, persistence or pace and episodes of decompensation. Given the minimal limitations resulting from his allegations of depression, Gipson has not shown the outcome of the proceeding would have been different had the ALJ with great specificity addressed depression in formulating Gipson's RFC. See *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988)(holding that ALJ is not required to incorporate limitations in RFC that he did not find to be supported in the record.)

As for exterional limitations, substantial evidence supports the ALJ's determination that Gipson would need to sit and/or stand at will, could not climb ropes, ladders or scaffolds or crawl,

occasionally could climb stairs and ramps, stoop, kneel, or crouch and could not use foot controls bilaterally. He needed a cane to ambulate. The ALJ incorporated findings made by Dr. Spoor and Dr. Andrade, as well as Roberto Sandoval, in his RFC determination. This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical

opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)   the physician's length of treatment of the claimant,

(2)   the physician's frequency of examination,

(3)   the nature and extent of the treatment relationship,

(4)   the support of the physician's opinion afforded by the medical evidence of record,

(5)   the consistency of the opinion with the record as a whole, and

(6)   the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion."  *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician

can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.

§ 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons

set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v.

Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the

Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in

administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical

records and testimony, and that his determination reflects those findings accurately.  The ALJ

summarized the evidence and set forth specific reasons concerning the weight given to the opinions

of the medical sources. While he did not specifically address each *Newton* factor, his decision makes

clear that the ALJ considered the specific criteria outlined in *Newton*. The ALJ's decision reflected

his familiarity with the record.  To the extent that the ALJ did not discuss whether Dr. Andrade

specialized in treating HIV/AIDS patients, Gipson has not shown he was prejudiced by the ALJ's

failure to discuss this. The ALJ discussed Dr. Andrae's treating records and how his records did not

support the conclusional responses in the Questionnaire.

With respect to the ALJ's consideration of the opinion evidence, he wrote:

The undersigned left the record open for fourteen days so the claimant could present
additional evidence from Dr. Andrade. To date the undersigned has not received any
additional evidence from the claimant or Dr. Andrade, other than one opinion from
Dr. Andrade dated November 30, 2010, which suggest the claimant's impairments
were not as debilitating as he alleged. In all, the claimant has the burden of
demonstrating he is unable to perform any work, which he has failed to do. As such,
the evidence before the undersigned does not merit a finding of "disabled."

As for opinion evidence, the undersigned rejects Dr. Andrae's opinions, as the
claimant's functionality, contained in Exhibits 8F, 9F, and 15 F because they are not
supported by the record or his treatment notes; his opinion is quite conclusory; he
provided very little explanation of the evidence relied on in forming his opinions; and
his opinions appear to contain inconsistencies, which are not adequately explained.

The undersigned notes, "It is well established that the opinions rendered on check-box or form reports, which do not contain any explanation or supporting rationale for the conclusions, may be accorded little or no weight."

Some weight is given to the opinions of treating physical therapist Robert Sandoval, PT because it is supported by substantial evidence. (Exhibit 5F). However, the undersigned finds that claimant is limited to less than sedentary work and not light work as opined by Mr. Sandoval.

In accordance with Social Security Ruling 96-6p, the undersigned has carefully considered the opinion of the state agency medical consultants Scott Spoor, M.D., and Leigh McCary, M.D. (Exhibits 4F and 6F). The residual functional capacity conclusion reached by Drs. Spoor and McCary both support a finding of "not disabled." However, evidence received at the hearing level shows that the claimant is more limited than they determined. The undersigned has found sufficient evidence that proves the claimant is limited to less than sedentary work. Although those physicians were non-examining, they are accorded some weight, particularly in the instant case; where there exists consistent medical and testimonial evidence to reach a similar conclusion that the claimant is capable of working.

Here, while the ALJ, as argued by Gipson, did not discuss each factor under §404.1527(d), the failure was, however, harmless. An error is harmless if it does not "affect the substantial rights of a party," *Taylor v. As true*, 706 F.3d 600, 603 (5th Cir. 2012), or when it "is inconceivable that the ALJ would have reached a different conclusion" absent the error. *Frank v. Barnhard*, 326 F.3d 618, 622 (5th Cir. 2003); *Bornette v. Barnhard*, 466 F.Supp. 2d 811, 816 (E.D.Tex. 2006)("Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error."). The ALJ's decision is a fair summary and characterization of the medical records. The ALJ thoroughly discussed the medical evidence and gave specific, detailed reasons for the weight given to opinions of Dr. Andrade, the state agency medical consultants and Gipson's treating physical therapist. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's

testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Gipson testified at  the February 16, 2010, hearing and the November 24, 2010, hearing. Gipson testified that he had not been able to work since February 2009 hospitalization. Gipson stated: "because I had to go to the hospital and they did a spinal tap on my back and it messed my legs up, so I couldn't operate the fork lift anymore." (Tr. 39).  He added:  "I never said I couldn't do any job, I mean, I noticed the economy is bad. I'm not blaming anything on the economy, no I'm not. But you know once I walk in there with these, people think I can't you know, I can't do anything and I can't walk without my cane.' (Tr. 39-40).  Gipson testified he has constant pain in his right leg, and numbness, and that the pain keeps him from sleeping. (Tr. 41-42). Gipson also testified about side

effects of his medications such as constipation, bad dreams, diarrhea, insomnia and impotence. (Tr. 42-43, 44, 45, 57). Gipson testified that he could not walk without his cane, especially outside.  (Tr. 43).  His daily activities included watching television, and laying down. (Tr. 56).

At the November 24, 2010, hearing, Gipson testified about his depression. He stated that he sees the "psyche doctor because I'm stressed out." (Tr. 101). He also testified that he could not be on his feet because of leg pain. (Tr. 102). On a scale of one to ten, Gipson rated his level of pain as an "8". (Tr. 103).  He testified the medications prescribed by Dr. Andrade had  made "it hurt worse." (Tr. 104-105). Gipson testified that he takes the antiretroviral medications and neurontin. Side effects of the medications include severe headache and diarrhea. (Tr. 117-118).  Gipson described his headache pain as "excruciating" and like a migraine. (Tr. 118).  Gipson stated he uses his cane to walk. (Tr. 103).

Gipson again testified about his daily activities. He spends his day at a care center and when he gets home, he watches television. (Tr. 109).  He does his own cooking and cleaning.  He takes public transportation. (Tr. 110-111).

In a Function Report dated May 1, 2009, Gipson stated he was able to clean and prepared his own meals. (Tr. 292, 293). His hobbies were playing video games and playing catch with his son. (Tr. 295).

Based on the reasons which follow, the ALJ rejected Gipson's testimony as not fully credible:

The claimant testified that he was unable to be on his feet two hours out of an eight-hour workday, sit still, or ambulate without a cane. He said walking was very painful. According to his testimony, if he sat too long he needed to lie down fifteen to twenty minutes in order to reduce his pain. He said he did this four to five times a day. He described constant pain, which he rated eight out of ten. Despite his impairments, he said he was able to live alone in a second story apartment, care for himself, perform household chores, cook, use public transportation without assistance, and go to Bering daily. He stated a typical day involved [going] to Bering, watching television, and lying down. He acknowledged that his HIV symptoms have been the same since

he was diagnosed in 1998 except for increased headaches. He described experiencing excruciating headaches several times a week yet he said he did not take pain medication for them including aspirin. He said his neuropathy was treated with medication that was ineffective and caused drowsiness, diarrhea, and headaches.

The claimant testified that he had to lie down four to five times a day, use a cane to ambulate, experienced constantly severe pain, and was unable to be on his feet more than a couple of hours during a workday.

His testimony that he had great difficulty sleeping at night secondary to pain was not consistent with the record. In June of 2010, he told Dr. Samiuddin that he worked hard during the day to help with sleep and that he slept well. Similarly, the record shows that he is capable of ambulating steadily without a cane. Although the claimant walks with a cane, there is no evidence that it is necessary. Psychiatric treatment notes revealed that claimant "arrived ambulatory into clinic with steady gait," which contradicts the claimant's testimony that he cannot get around without a cane. (Exhibit 13F). In addition, treating physician Roberto Andrade, M.D., noted that he could not find anything that would explain the claimant's limping and that it was the claimant who requested a cane. Inconsistent with an allegation of disability, the claimant asked Dr. Andrade to fill out a form for his work stating that he could not drive a forklift but otherwise he could do the rest of his work. (Exhibit 5F).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The record well documents that claimant's unfortunate battle with HIV/AIDS, Hepatitis C, and neuropathy. There is no doubt that the claimant is experiencing limitations secondary to these impairments; however, the real issue is whether these impairments, either singularly or in combination, preclude all substantial gainful activity.

The record conclusively shows that the claimant's HIV/AIDS responded well to pharmacological intervention and control. Laboratory results show and treating source Roberto Andrade, M.D., confirmed that the claimant was asymptomatic and stable. Despite a significant history of noncompliance, including being off medication for 2 years, Dr. Andrade noted the claimant was in no acute distress, had no complaints, was having a great response to antiretroviral therapy with no obvious side effects, and that he was already undetectable. (Exhibits 1F, 5F, and 13F). The claimant's noncompliance with his treatment regimen and subsequent good results upon compliance detracts from his credibility on the issue of disability. The undersigned notes, "It is well settled that any impairment, including mental impairments, which is controlled or controllable by medication cannot be made the

basis for a finding of disability."

A physical examination in April of 2009 was unremarkable. There was no sign of edema, cyanosis, or clubbing in his extremities; neurologically he was grossly intact with normal sensorium and knee reflexes. Although the claimant presented with a limp, the examining physician stated he could not find anything during the physical examination that would explain why the claimant was limping. (Exhibit 3F).

Additionally, there is strong evidence the claimant's activities of daily living are not limited as one would expect if he were totally disabled. Evidence that he lives alone, grocery shops, grooms and bathes himself, cares for himself, cooks, cleans, does he own laundry, visits Bering daily, walks to public transportation, plays catch with his son, fills prescriptions, and takes his medication without assistance is inconsistent with his allegations of disability.

The undersigned left the record open for fourteen days so the claimant could present additional evidence from Dr. Andrade. To date the undersigned has not received any additional evidence from the claimant or Dr. Andrade, other than one opinion from Dr. Andrade dated November 30, 2010, which suggest the claimant's impairments were not as debilitating as he alleged. In all, the claimant has the burden of demonstrating he is unable to perform any work, which he has failed to do. As such, the evidence before the undersigned does not merit a finding of "disabled." (Tr. 14-15).

There is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly.   Based on this record, there are significant inconsistencies between Gipson's subjective complaints including pain and the objective medical evidence.   The ALJ identified the inconsistencies and gave specific reasons for rejecting Gipson's subjective complaints.   Accordingly, this factor also supports the ALJ's decision.

## D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.   A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.   42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Charles Poor, a vocational expert ("VE"), at the November 24, 2010, hearing.[5] "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).   It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical questions to the VE:

ALJ: Let me lay out an RFC for you though to have all my options open here. So okay, I ask this of you, assume a person of Mr. Gipson's age, he is now 39, he has a high school education, he went back and got his GED, he has past relevant work experience that is both unskilled and semi-skilled, and a person with these characteristics would be able to perform a sedentary level of work with a sit/stand option; no climbing of ladders, ropes, or scaffolds; no crawling; only occasional climbing of stairs and ramps; only occasional stooping, kneeling, and crouching; no use of foot controls bilaterally; and this person must use a cane to ambulate; are there occupations in the national, regional economy that such a person could perform?

VE: Yeah–

ALJ: Did you get all that?

---

[5] A different Vocational Expert, Karen Nielson, testified at the first hearing that was held February 16, 2010.

VE: Yeah, I did, the use of the cane would be limited strictly to ambulating, not standing in place?

ALJ: That's correct.

VE: Okay. Yeah, a person as detailed in your hypothetical could perform some jobs that would [be] classified as sedentary and or light, and unskilled.

      *      *      *

ALJ: Okay. And again, to reiterate, obviously if I find that he's not — cannot be on his feet at least two hours out of an eight hour workday that is there would be no jobs and adding another condition, if this person would require two or more additional rest breaks during the day of each of a duration of 10 to 15 minutes, would that be consistent with employment?

VE: No, that's not a description of competitive work.

ALJ: And if this person would fail to concentrate 20 percent or if they would concentrate on task more than 20 percent of the time, would that be consistent with employment?

VE: It would not. (Tr. 120-121, 125-126).

The record further shows that Gipson's attorney questioned the Vocational Expert about jobs available to Gipson if he required a cane not only to ambulate but also to stand in place. The exchange follows:

Atty: Mr. Poor, given his honors first hypothetical where the – one of the limitations was has to use the cane to ambulate but not to stand in place, if the hypothetical claimant were otherwise precisely described by his honor's hypothetical but did not have to use the cane, whether to ambulate or to stand in place any time he's on his feet, does that change your testimony?

VE: Well, I think it would, because the jobs I mentioned obviously require bilateral upper extremity functioning and if one of the upper extremities is holding on to a cane for stability or for whatever purpose than that would eliminate the jobs I mentioned.

Atty: Okay.

ALJ: Would there be any jobs at that point?

VE: Not really, not in significant numbers.

ALJ: So, if you have the same hypothetical I laid out and needed a cane to even stand, stand in place if you will, there'd be no jobs at all is that correct–

VE: Not in significant–

ALJ: That's your testimony?

VE: numbers. Not in significant numbers. (Tr. 127).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Gipson argues that because he requires a cane to ambulate and stand, the ALJ erred by failing to include this in his RFC assessment and in his hypothetical question to the Vocational  Expert. According to Gipson, his need for a cane to ambulate and stand should have been included in his RFC, and had it been, the Vocational Expert's testimony confirms there are no jobs available to Gipson.

Here, the ALJ's RFC included the  limitations supported by the record, i.e, that Gipson needed a cane to ambulate. The ALJ's hypothetical question included the limitations he found supported by the record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Gipson was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Gipson could perform work as a sorter, an optical goods worker, a jewelry bench worker or bench worker working with jewelry related products because the above described jobs are consistent with his RFC.  The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to

support the ALJ's conclusion that Gipson was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V.  Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Gipson was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 14), is DENIED, Defendant's Motion for Summary Judgment (Document No. 12) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 6th  day of November, 2013

_____

_Frances H. Stacy_
Frances H. Stacy
United States Magistrate Judge